EDMUND A. WHITMAN & others *vs.* EDWARD P. SHAW & others.

SAME *vs.* ENOCH M. READ & others.

Suffolk.    January 10, 13, 1896. — June 17, 1896.

Present: FIELD, C. J., ALLEN, HOLMES, LATHROP, & BARKER, JJ.

*Writ of Entry — Evidence — Ancient Plan and Field Notes — Trial — Adverse Possession.*

Upon the preliminary question whether an ancient plan, offered in evidence, was made in actual transactions, two deeds executed in the two following years, referring to the survey and giving boundaries, reciting that a certain road then building, shown on the plan, ran over the land, and giving an area which corresponded with that on the plan, are admissible in evidence at the trial of a writ of entry to recover a parcel of land lying on one side of the road mentioned.

If a deed, which is itself not ancient, but which refers to an ancient plan, is admitted in evidence at the trial of a writ of entry, and bounds the land described on one side of a marsh, of which the demanded premises are alleged to be a part, and the demandant offers to withdraw the deed at the close of the evidence, but the tenant objects to its withdrawal, the latter is not harmed by its remaining in the case, there being abundant evidence without it.

Upon the issue of the admissibility in evidence, at the trial of a writ of entry, of an ancient plan and field notes, a question to a surveyor, in whose custody they were, as to the contents of the field notes, and whether they related to a certain marsh, of which the demanded premises are alleged to be a part, is a proper preliminary question.

It is competent, for the purpose of showing at the trial of a writ of entry the accuracy of an ancient plan offered in evidence, to show its use by other surveyors in making their own surveys, and they are entitled to give their opinion upon it as a whole, whether they have resurveyed the parcels in dispute or not.

At the trial of a writ of entry, an ancient plan and field notes, offered in evidence, were produced by a surveyor, who testified that he had had them in his possession since the death of one G., formerly a lawyer; and another surveyor testified that he had seen the plan in the possession of G. twenty years before the trial. *Held*, that the tenant was not entitled to contend that the plan and field notes were not produced from any proper custody.

Upon the preliminary question of the genuineness and accuracy of a plan, not dated or signed but alleged to have been made in 1818 by W., a surveyor, and offered in evidence at the trial of a writ of entry, other plans dated in 1820 and 1823, and signed by W., were admitted in evidence. They represented certain lots in the vicinity of a marsh, of which the demanded premises were alleged to be a part, and were shown on the first named plan; they were drawn on the same scale, and were identical with the same lots shown on that plan; and they came from the custody of one C., who, in 1853, sold the lots to one D. *Held*, that they were properly admitted. *Held, also,* that a plan made by W. in 1818, produced from the papers of the estate of one F., was admissible for the same purpose.

A plan of nearly one hundred acres of land, drawn to a scale, not dated or bearing the name of any surveyor, but shown to have been made by a surveyor of acknowledged skill and accuracy, long since deceased, and appearing to be well known to surveyors and to have been used and tested by them in their own surveys, and accompanied by field notes showing that the survey was made in 1818, is, together with the field notes, admissible in evidence at the trial of a writ of entry to recover land included in that shown on the plan, the preliminary evidence having authorized the finding that the plan and the field notes were not only ancient, but also genuine and accurate, and prepared for and used in actual transactions.

At the trial of a writ of entry, evidence that the taxes on the demanded premises had been assessed to and paid by the tenant or his predecessor in title for more than twenty years, if there is no evidence of actual occupation or possession by the tenant, is properly excluded.

TWO WRITS OF ENTRY, dated May 18 and June 7, 1892, respectively, to recover possession of two parcels of land in that part of Boston formerly Brookline. Pleas, *nul disseisin.* The cases were tried together in the Superior Court, without a jury, before *Hammond,* J., who found for the demandants in each case; and the tenants alleged exceptions, which appear in the opinion.

*H. G. Allen,* for the tenants.

*S. J. Elder & N. U. Walker,* for the demandants.

LATHROP, J.　These are two writs of entry to recover posses-
sion of two parcels of land in that part of Boston formerly
Brookline, and lying on the southeasterly side of Brookline
Avenue, formerly known as the Punch Bowl road.

By the St. of 1814, c. 39, § 1, the Boston and Roxbury Mill
Corporation was incorporated, and authorized to " purchase and
hold real and personal estate, (not exceeding in value two mil-
lions of dollars,) necessary to promote the objects of the corpo-
ration."　By § 2 it was authorized to build a dam from Charles
Street at the westerly end of Beacon Street in Boston, to the
upland at Sewall's Point, so called, in Brookline; and by § 3 it
.was further authorized to " open a road not more than eighty
feet and not less than forty-two feet wide, from some point of
said dam where it crosses the marshes in Brookline, to the end
of the Worcester Turnpike, near the Punch Bowl tavern, so
called, in said Brookline."

It appears from the exceptions that in or about September,
1819, the corporation was at work on the Punch Bowl road, and
built it to the width of forty-two feet, taking the earth for the
road from the marshes on the southeasterly side, and thus form-
ing a canal.　In 1832 the road was widened on the southeast
side eighteen feet, so as to make the whole width of the road
sixty feet.

In 1814, Benjamin White and Warren White were seised in
fee of a parcel of marsh land, which was thus described in a
.deed to Benjamin White in 1743: " Four acres bounded as
followeth, easterly upon a creek, southeast upon marsh land of
Robert Murdock, southwest upon marsh of Captain John Win-
chester and Mr. James Allen, westerly upon marsh of Thomas
Woodward, and north upon marsh of Caleb Dana, however
otherwise bounded or reputed to be bounded."　The exceptions
set out at length the chain of title from Benjamin White and
Warren White to the demandants; but we understand that no
question is made as to the title of the demandants, except as
hereinafter stated.

The writ in the first case relates to a parcel of land situated
in the canal above mentioned, and the demandants contend that
this is a part of the White marsh.

The writ in the second case also relates, as the demandants

contend, to a portion of the White marsh, being a strip of land containing ten thousand five hundred and forty-three square feet, extending from the southeasterly side of the canal to a creek.

The tenants contend that there was a lost grant of the first parcel from the owners of the White marsh to the predecessors in title of the tenants, if this parcel ever belonged to the White marsh, which they deny to be the fact. As to the land sought to be recovered in the second case, they contend that the boundary line follows the line of an old ditch across the marsh from the canal to the creek on the southerly side of the parcel demanded; and that there is no evidence that the White marsh ever included any part of this parcel. The tenants also claim adverse possession of both parcels for more than twenty years.

The tenants' record title was under a deed executed in 1832, and duly recorded, by which the Boston and Roxbury Mill Corporation released all its right, title, and interest in and to all lands southeast of said Punch Bowl road to the Boston Water Power Company. Next, by a deed dated February 16, 1871, from the Boston Water Power Company to Ballou and others, trustees, which included, among other parcels of land, the parcels in question in this case, by metes and bounds, and by reference to a plan. This plan, however, the surveyor who made it, and who was called as a witness for the tenants, testified, on cross-examination, was not made as the result of any survey or examination of any existing plan, but was drawn so as to include the demanded premises by the direction of the then president of the Boston Water Power Company, he pointing out the boundaries on the ground. The deed and plan were duly recorded, and the tenants claim through intermediate conveyances from the grantees in this deed.

The justice of the Superior Court, who heard the case without a jury, found for the demandants, and also found specially that there was no lost grant of the first parcel of land. There were other special findings, but none of them is now material.

It was not disputed that, in 1819, William Aspinwall owned a tract of marsh land adjoining the White marsh, on its northerly side, and by deed conveyed to the Boston and Roxbury Mill Corporation a portion of his marsh lot, bounded as follows: " Southerly on John Warren's marsh; southeasterly on marsh

of Benjamin White; easterly, northeasterly, and northerly on the creek between the premises and marsh of David Hyslop and Jonathan Hammond; and northwesterly on my other marsh by a line drawn parallel with and forty-five feet from the middle line of the new Punch Bowl road, which said corporation have lain out and partly made over the premises." From this description and the facts already stated it appears that this deed conveyed a strip forty-five feet in width, twenty-one feet of which would be in the road, and twenty-four feet in the canal. The deed, being an ancient deed, was evidence that the White marsh also extended at that time to the middle of the road, and included the land under the canal.

The demandants do not in this case contend that they are entitled to possession of the land under the road.

The principal questions in the case relate to the admission in evidence of a plan and field notes alleged to have been made by Mather Withington in the year 1818, and to certain deeds supposed to refer to this plan ; to the testimony of several surveyors in regard to the accuracy of this plan and by whom it was made, and to other plans based upon it.

The plan itself has been produced before us. It is without doubt an ancient plan. It is stated by the counsel for the tenants, in their brief, that it purports to show nearly one hundred acres of land, and we assume this to be so. It is drawn on a scale of four rods to an inch, and this fact is stated on the face of it. It shows the Punch Bowl road, and indicates the lines of the Brighton road, and of what is now the extension of Beacon Street, though the two latter are not named, from the junction of the three roads ; the marshes between the Brighton road and the Charles River ; the marshes between the roads ; and the marshes on the southeasterly side of the Punch Bowl road and the creek which is the southeasterly boundary of the White marsh. It further shows the division of the marshes among the several owners, and the contents of each lot. On the margin are the names of the owners of marshes adjoining the three roads, with figures corresponding to the contents stated in the plan, and also the amounts of land under the road, and in some instances under the canal.

The plan is not dated, and does not bear the name of any

surveyor; but there was abundant evidence in the case that it was made by Mather Withington, who was a surveyor of acknowledged skill and accuracy, and who has long since deceased. There was also evidence from a date in the field notes that the survey was made in July, 1818. The plan appeared by the evidence to be well known to surveyors, and to have been used and tested by them in their own surveys; and there was evidence that no earlier survey of the Brookline marshes was known.

It is apparent from an inspection of the plan and the evidence that it related to actual transactions. It is not to be supposed that such a plan was made for amusement. The Boston and Roxbury Mill Corporation had authority to purchase land and to build the roads over the marshes. It would be necessary to know who were the owners of the marshes, and how much each man owned, in order to ascertain to whom compensation should be made. A comprehensive survey of the entire tract would be indispensable. When we find still extant a plan of the land and field notes showing the measurements, it is a fair inference of fact that the surveyor was employed either by the corporation or by the marsh owners, as they were the only ones interested in having the survey made.

We do not find in our reports any well defined statement of the rule in regard to the admissibility of ancient plans.

In *Chapman* v. *Edmands*, 3 Allen, 512, an ancient plan, which was in the possession of the persons under whom the demandants claimed, was held to be admissible against them on the ground that it was a declaration against their interest.

In *Drury* v. *Midland Railroad*, 127 Mass. 571, 581, a plan made by Mather Withington in 1816, and a plan of the Blake estate made in 1805, were admitted in evidence. The original bill of exceptions states that it was not contended that the Blake estate included any part of the estate in controversy; but the evidence was offered for the purpose of showing the boundaries between the Blake marsh and the land of one Clap, through whom the petitioner claimed title, and the position of the creek. It was held that the evidence was, at least, competent as tending to show the position of the creek, which governed the claims of all adjacent proprietors of flats, " and in that respect was a common boundary to many interested persons." As to the

Withington plan, which covered the line in dispute, it was said that it "seems to have been admissible also in rebuttal, when accompanied by evidence that it came from the custody of those under whom the respondents claim to derive title."

We do not understand that in either of these cases the court intended to lay down a general rule applicable to all cases where the admissibility in evidence of ancient plans is concerned, for the second case goes beyond the first; and in *Boston Water Power Co.* v. *Hanlon*, 132 Mass. 483, it is apparently conceded that ancient plans are admissible upon the same principles that ancient deeds, although between strangers, are admissible when they relate to actual transactions. In other jurisdictions ancient plans have been frequently held to be admissible. *Gibson* v. *Poor*, 21 N. H 440. *Lawrence* v. *Tennant*, 64 N. H. 532. *Goodwin* v. *Jack*, 62 Maine, 414. *Bogardus* v. *Trinity Church*, 4 Sandf. Ch. 633. *St. Louis Public Schools* v. *Erskine*, 31 Mo. 110; *S. C. nom. The Schools* v. *Risley*, 10 Wall. 91. *McCausland* v. *Fleming*, 63 Penn. St. 36.

We see no reason why the same rule should not obtain here. Such plans are frequently admitted in the trial courts, if they throw light upon the question in dispute. An instance of this is shown in *Commonwealth* v. *Roxbury*, 9 Gray, 451, 458, 459, where among the maps put in evidence are mentioned the map of Boston Harbor by Des Barres, in 1775, and Mather Withington's plan of Roxbury, in 1794. The map of Des Barres shows not only what is now known as the harbor, but also the Back Bay, so called, and the shores adjacent. It is now in the custody of the Secretary of the Commonwealth.

In *Hathaway* v. *Evans*, 113 Mass. 264, 267, it was said by Mr. Justice Devens, in speaking of certain deeds which had been admitted in evidence in the court below: "These deeds were objected to by the plaintiff as *res inter alios*. If they were more than thirty years old, they were admissible upon the ground that recitals in ancient deeds (under which neither party to the action claims) are competent evidence to prove the location of a disputed line. *Sparhawk* v. *Bullard*, 1 Met. 95. *Morris* v. *Callanan*, 105 Mass. 129. Nor can it make any difference whether the line so attempted to be proved is the one immediately in dispute between the parties, or one from the

position of which the location of the immediately disputed line can be determined." See also *Randall* v. *Chase*, 133 Mass. 210.

In *Sparhawk* v. *Bullard*, 1 Met. 95, 101, it was said by Mr. Justice Wilde : " Recitals in ancient deeds are always competent evidence, and are presumed to be true, unless the contrary can be made to appear."

The tenants, however, contend that this case is governed by that of *Boston Water Power Co.* v. *Hanlon*, 132 Mass. 483. As appears by the original bill of exceptions in that case, the demandant accepted as correct the rule of law that ancient plans were only admissible in evidence when shown to be made by the procurement of the predecessors in title of the parties. It then sought to show that certain " plottings for plans," so called in the bill of exceptions, and field notes of Mather With-ington, were made by the procurement of the predecessors in title of the demandant. The justice who tried the case in the Superior Court " ruled that, for aught that appeared in evidence, said plottings for plans and field notes were *inter alios*, and that there was not sufficient evidence that said survey or plottings for plans were ever made by the authority or procurement of said " predecessors in title. To this ruling the demandant ex-cepted, as it did also to another ruling, which need not be stated. Neither of these exceptions was argued in this court; but the demandant sought to sustain the admissibility of the " plottings for plans " and the field notes on the ground that they came within the rule of ancient deeds. It was said in the course of the opinion : " But plottings for plans and .field notes are mem-oranda only, which may never have been acted on. They are preparations for a transaction which may never have taken place. The fact that they are so full that plans could be made from them is not important ; they still lack the element which makes plans admissible."

It is undoubtedly true that a plot, map, or plan may be so imperfect that the judge presiding at the trial may be justified in declining to admit it. What the so called " plottings for plans " were in the case last cited we have no knowledge. The words were evidently used as meaning something imperfect and preliminary. In the case at bar, the paper is called a plan, is drawn to a scale, and, although not signed, the authorship of it s shown.

On the preliminary question whether the plan and field notes were made in actual transactions, and whether they were accurate, and also on the question of boundary, the demandants were allowed to put in several deeds, to the admission of which exceptions were taken.

The Clark deeds were to the Boston and Roxbury Mill Corporation, were executed in 1819 and 1820, and the material part of each deed was this: " The following piece of marsh land, situated in said Brookline, containing by Mr. Withington's survey three acres three quarters and twenty-one rods." The boundaries were given, and it was recited that the new Punch Bowl road, then building, ran over the land. The area given corresponded with that on the plan. We are of opinion that this evidence was admissible for the purpose for which it was offered, namely, to show that the Withington plan was a part of actual transactions.

The Sheafe and Wheelock deeds of 1870 referred to a plan of Mather Withington, dated July, 1818. The land bounded on one side on the White marsh. These deeds were not ancient deeds; but as the demandants offered to withdraw them at the close of the evidence, and the tenants objected to their withdrawal, and as the evidence was abundant without them, we are of opinion that the tenants were not harmed by their remaining in the case.

Various exceptions were taken to questions put to surveyors for the purpose of showing the accuracy of the plan in question, and that the plan corresponded to the field notes. Some of these were waived at the hearing before this court, and others were insisted upon. The question to Mr. Bowditch as to the contents of the field notes, and whether they related to the White marsh, is objected to because the notes were not then in evidence. But this was a proper preliminary question. It was entirely competent, also, for the purpose of showing the accuracy of the plan, to show its use by other surveyors in making their own surveys, and they were entitled to give their opinion upon it as a whole, whether they had resurveyed the parcels in dispute or not.

It is next contended by the tenants that the plan and field notes were not produced from any proper custody. They were produced by Mr. Bowditch, who testified that he had had them in

his possession since the death of Mr. Griggs, formerly a lawyer in Boston. Another surveyor testified that he had seen the plan in the possession of Mr. Griggs in 1872. It is of course impossible in most instances to trace documents or plans which originally belonged to private persons, and to follow them from the custody of one person to another. It is said by Mr. Stephen : " Documents are said to be in proper custody if they are in the place in which, and under the care of the person with whom, they would naturally be; but no custody is improper if it is proved to have had a legitimate origin, or if the circumstances of the particular case are such as to render such an origin probable." Steph. Dig. Ev., art. 88. So in *Gibson* v. *Poor*, 21 N. H. 440, it was held that the fact that an ancient plan is not found in its proper place only goes to the question of its genuineness. It was also held that the fact that an ancient plan has no date is immaterial.

Other plans dated in 1820 and 1823, and signed by Mather Withington, were admitted in evidence, against the tenants' exception. They represented certain lots in the vicinity of the White marsh, and were shown on the plan produced by Mr. Bowditch. They came from the custody of one Crafts, who, in 1853, sold the lots to one Dana. The plan of 1820 showed a lot adjoining the White marsh on the opposite side of the creek. The plan of 1823 showed six lots. These lots were drawn on the same scale, and were identical with the same lots as shown on the Bowditch plan. We are of opinion that these plans were admissible on the preliminary question of the genuineness and accuracy of the Bowditch plan.

The plan of Mather Withington, dated July, 1818, produced from the papers of the estate of Mr. Ebenezer Francis, was also admissible for the same purpose.

We are of opinion that no error is shown in the admission of the preliminary evidence ; and that on this evidence, which comprised much testimony in addition to that specifically set forth in this opinion, it was competent for the justice who presided at the trial to find that the plan and field notes were not only ancient, but also genuine and accurate, and prepared for and used in actual transactions. The plan was therefore properly admitted in evidence, and we see no reason why the field

notes were not also admissible. There was ₍expert evidence that, taking the field notes in connection with the plan, the line of the 'White marsh included both lots. The presiding justice was therefore, so far as this part of the case is concerned, warranted in finding for the demandants.

The remaining exception of the tenants relates to the exclusion of evidence that the taxes upon both of the demanded parcels had been assessed by the city of Boston to, and had been paid by, the tenants or their predecessors in title, from and including the year 1870 to the time of the trial.

The tenants contend that this evidence should have been admitted upon the question of adverse possession. There is nothing in the bill of exceptions to show any actual occupation or possession by the tenants of either of the parcels demanded. If there had been such evidence, then the character of it would have been a material question in the case. The assessment of taxes to a person in possession, and the payment of the taxes by him, we have no doubt, are admissible to show that his possession is adverse. *Elwell* v. *Hinckley*, 138 Mass. 225. But where a person is not in actual occupation or possession, payment of taxes is not, in and of itself, evidence of adverse possession. *Little* v. *Megquier*, 2 Greenl. 176. *Reed* v. *Field*, 15 Vt. 672. *Paine* v. *Hutchins*, 49 Vt. 314, 317. *Naglee* v. *Albright*, 4 Whart. 291. *Cornelius* v. *Giberson*, 1 Dutch. 1, 36. *Thompson* v. *Burhans*, 61 N. Y. 52. *Miller* v. *Long Island Railroad*, 71 N. Y. 380. *Chapman* v. *Templeton*, 53 Mo. 463. *Cashman* v. *Cashman*, 50 Mo. App. 663. *Miller* v. *Davis*, 106 Mich. . *Brown* v. *Rose*, 48 Iowa, 231. *Sioux City & Iowa Falls Town Lot & Land Co.* v. *Wilson*, 50 Iowa, 422. *Raymond* v. *Morrison*, 59 Iowa, 371. *Malloy* v. *Bruden*, 86 N. C. 251.

The evidence offered was therefore properly excluded. Title to land cannot be acquired by taking and recording a deed from a person who has no title to it, and paying the taxes upon it.

*Exceptions overruled.*